Katherine Anne **MEYER**

v.

George **BUSH**, Chairman, Task Force on Regulatory Relief, et al., **Appellants.**

No. 92–5029.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 18, 1992.

Decided Jan. 8, 1993.

---

Douglas Letter, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Matthew M. Collette, Atty., Dept. of Justice, Washington, DC, were on the brief, for appellants.

Theresa A. Amato, with whom Alan B. Morrison and David C. Vladeck, Washington, DC, were on the brief, for appellee.

Before: WALD, SILBERMAN, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Circuit Judge WALD.

SILBERMAN, Circuit Judge:

The district court, at the behest of the government, certified to us on interlocutory appeal the question whether President Reagan's Task Force on Regulatory Relief, headed by then-Vice President Bush and composed of certain cabinet members, is an "agency" for purposes of the Freedom of Information Act, 5 U.S.C. § 552. Appellee seeks certain Task Force documents under the Act. We reverse the district court's determination and hold that the Task Force was not an "agency."

I.

Soon after his inauguration in 1981, President Reagan embarked on an effort to reduce regulatory burdens on the economy. As part of that program, the President established a cabinet-level Task Force on Regulatory Relief which included the Vice President, the Attorney General, the Secretaries of the Treasury, Commerce and Labor Departments, the Director of the Office of Management and Budget (OMB), the Chairman of the Council of Economic Advisers, and the President's Assistant for Policy Planning. President Reagan directed the Task Force to "review pending regulations, study past regulations with an eye towards revising them and recommend ap-

propriate legislative remedies." As head of the Task Force, Vice President Bush named the Administrator for OMB's Office of Information and Regulatory Affairs (OIRA) as the Executive Director of the Task Force and a Special Assistant to the President as the Associate Director. Using staff from OMB, the Task Force operated from the Office of the Vice President.

President Reagan followed up the creation of the Task Force with Executive Order 12,291, which details the procedures for developing regulations and requires agencies to use cost/benefit analysis when making decisions. *See* Exec. Order No. 12,291, 46 Fed.Reg. 13,193 (1981). Agencies must issue a Regulatory Impact Analysis (RIA) for any regulations that have a significant effect on the economy—defined as "major rules" in the Executive Order. Subject to the direction of the Task Force, the OMB Director has the authority to review RIAs and to issue guidelines both for filing the RIAs and for identifying major rules. The Order also gives the OMB Director—subject to the Task Force's guidance—the authority, among other things: (1) to designate regulations as major rules; (2) to require agencies to seek additional information in connection with a regulation; (3) to require interagency consultation designed to reduce conflicting regulations; (4) to develop procedures for estimating the annual social costs and benefits of regulations; and (5) to prepare recommendations to the President for changes in agency statutes. Exec. Order No. 12,291, § 6. If any disagreements arise between an agency and OMB, the Task Force "shall resolve any issues raised under this Order or ensure that they are presented to the President." *Id.* § 3(e)(1).

Thus, the Order authorized OMB, under Task Force guidance, to provide policy advice, to require agencies to seek interagency coordination, and even to delay regulatory proposals. But it did not confer any power to prevent an agency from carrying out its legal duty. The Order cautioned that the agencies must follow its provisions only "to the extent permitted by law." *Id.* § 2. And § 8 exempts "[a]ny regulation for which consideration or re-

consideration ... would conflict with deadlines imposed by statute or by judicial order." Moreover, in § 9, the President directed that the Order "is intended only to improve the internal management of the Federal government, and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States."

The Task Force was in operation for two periods during the Reagan Administration. From 1981 to its initial termination in 1983, the Task Force reviewed and assessed regulations. In its "final report," the Task Force stated that it had "designated a total of 119 of the most questionable [existing] rules and regulatory programs for high-priority agency reconsideration," 76 of which the Administration took final action "to revise or eliminate," and 27 of which received "partial action or formal proposals for change." Under the Executive Order, OMB had reviewed 6,701 proposed and final regulations, including 89 final, and 53 proposed, "major" regulations. After a hiatus of three years, President Reagan reactivated the Task Force on December 15, 1986, and gave it much the same mission it had before. The Task Force was phased out after the transition to the Bush Administration.

On June 29, 1988, appellee submitted her FOIA request for documents held by "the Task Force on Regulatory Relief, Vice President George Bush, who Chairs the Task Force, or any other member of the Task Force." Appellee sought three types of documents: "(1) [a]ll reports, which have been issued since February, 1981, concerning the accomplishments of the Task Force; (2) [a]ll reports, which have been issued since February, 1981, which list or identify the regulations that the Task Force has reviewed; and (3) all reports, memoranda, correspondence, or other written documents transmitted to or from the Task Force or any of its members since January 1, 1985, concerning the Task Force's review of or involvement in regulations that were or still are under consideration by the Environmental Protection Agency, the Food and Drug Administration, or the Occupational

Safety and Health Administration." After denying appellee's request, attorneys of the Vice President's office referred her to the OIRA Administrator, who also served as Executive Director of the Task Force.

Upon receiving appellee's renewed request, OMB officials conducted a search of publicly available reports and press releases, copies of Task Force documents located at OMB, and OMB's own files for records related to the Task Force. OMB did not conduct a search of the Vice President's files, which the government claimed were exempt from FOIA. In response to appellee's first two requests, OMB released only publicly available documents in its files. OMB identified eight "documents" covered by appellee's third request, but declined to provide them to appellee. The first seven documents are pages from briefing books prepared for the Vice President and other members of the Task Force (in 1987–88) for use during Task Force deliberations. They discuss agency regulations, the Task Force's staff analysis of those regulations, and policy recommendations to the Task Force. Copies of the briefing books were kept in "Task Force files" in the office of the OIRA Administrator, who, as it will be recalled, was also Executive Director of the Task Force. Although located at OMB, the files were segregated from OMB files. The government declined to produce these documents on the grounds that neither the Vice President nor the Task Force are "agencies" under FOIA.

The eighth document, a letter sent by the OIRA Administrator to Health and Human Services Secretary Bowen, contains "recommendations and guidance to be incorporated in future administrative and legislative proposals to improve the [FDA's investigational new drug] approval process," according to OMB officials. OMB withheld the letter under exemption 5 of FOIA, 5 U.S.C. § 552(b)(5), as a pre-decisional memorandum. The government concedes that the letter is an OMB—not a Task Force—document and that OMB is an agency within the meaning of FOIA. Thus, the eighth document is not subject to this interlocutory appeal.

Appellee brought suit in the district court challenging the adequacy of the document search, the government's specific refusal to search the Vice President's files, and the withholding of the eight documents. On a motion for summary judgment, the government claimed that the first seven documents were not "agency" documents, that the eighth was exempt, and that the search was adequate. Denying the motion, the district court held that the documents were Task Force documents, not the Vice President's, and that the Task Force was an agency under FOIA. *See Meyer v. Bush,* Civil Action No. 88–3122, Mem. Op., 1991 WL 212215 (D.D.C. Sept. 30, 1991). According to the court, "the Task Force was not formed simply to advise and assist the President," but rather "had substantial, independent, directorial authority." *Id.* The court did not decide whether the government was obliged to search the Vice President's files, and, upon the government's motion, certified as appropriate for an interlocutory appeal the question whether the Task Force is an agency under FOIA.

## II.

The district court applied the correct governing law in determining whether a body within the Executive Office of the President is a FOIA "agency." As amended in 1974, the Act defines "agency" as "any executive department, military department, Government corporation, Government controlled corporation, *or other establishment in the executive branch of the Government (including the Executive Office of the President),* or any independent regulatory agency." 5 U.S.C. § 552(e) (emphasis added).

As clearly shown by the legislative history, however, Congress intended to codify our earlier decision (interpreting more general predecessor language) in *Soucie v. David,* 448 F.2d 1067 (D.C.Cir.1971).[1] In

---

**1.** "With respect to the meaning of the term 'Executive Office of the President' the conferees intend the result reached in *Soucie v. David.* The term is not to be interpreted as including

that case, we held that the Office of Science and Technology (OST), a distinct entity within the Executive Office of the President, was a FOIA "agency." Although we acknowledged that OST advised and assisted the President, we emphasized that OST also had inherited from the National Science Foundation *"substantial independent authority,"* such as evaluating federal programs, initiating and supporting research, and awarding scholarships. *Id.* at 1073–75 (emphasis added); *see also Rushforth v. Council of Economic Advisers*, 762 F.2d 1038, 1041 (D.C.Cir.1985). OST was a FOIA agency precisely because it could act directly and independently beyond advising and assisting the President. "By virtue of its independent function of evaluating federal programs, the OST must be regarded as an agency subject to the APA and the Freedom of Information Act." *Soucie*, 448 F.2d at 1075. In *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), the Supreme Court followed the legislative history and held that the Act did not cover " 'the President's immediate personal staff *or* units in the Executive Office whose sole function is to advise and assist the President.' " *Id.* at 156, 100 S.Ct. at 971 (quoting H.R. CONF. REP. No. 1380, 93d Cong., 2d Sess. 14 (1974)) (emphasis added).

Shortly after *Kissinger*, in *Pacific Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259 (D.C.Cir.1980), we decided that the Council on Environmental Quality (CEQ), an entity within the Executive Office of the President, was a FOIA agency. But subsequently in *Rushforth v. Council of Economic Advisers*, 762 F.2d 1038 (D.C.Cir.1985), we distinguished the Council of Economic Advisers (CEA) from the CEQ and exempted it from FOIA. We did

so even though the House Report (on which the dissent relies, dissent at 1298) explicitly listed the CEA as an agency under FOIA. We concluded that the subsequent Conference Report's adoption of the *Soucie* test directly had undercut the House Report. We conceded that "the statutes organizing CEA and CEQ are, for all practical purposes, identical." *Id.* at 1041. Both organizations, moreover, performed duties, enumerated by statute, directed at providing advice and assistance to the President. CEQ differed, however, because several executive orders had given it the power to coordinate federal environmental programs and to issue guidelines to federal agencies for preparing environmental impact statements. *Id.* CEQ also had the authority to promulgate regulations—legally binding on the agencies—implementing the procedural provisions of the National Environmental Policy Act, 83 Stat. 852 (1970).[2] *See also Energy Research Found. v. Defense Nuclear Facilities Safety Bd.*, 917 F.2d 581, 584–85 (D.C.Cir.1990). CEA had no similar power to issue formal, legally authoritative commands to entities or persons within or outside the executive branch. As we observed: "CEA is directed to appraise federal programs relative to a particular statutory policy and make recommendations to the President in that regard." *Rushforth*, 762 F.2d at 1043. But the "CEA has no regulatory power under [its] statute. It cannot fund projects based on [its] appraisal, as OST might, nor can it issue regulations for procedures based on the appraisals, as CEQ might." *Id.*

Appellee argues that the Task Force bore a closer resemblance to the CEQ than the CEA because it evaluated agency regulatory efforts and had authority to provide some direction over agency rulemaking. In other words, appellee focuses not on the

---

the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." H.R.REP. No. 1380, 93d Cong., 2d Sess. 14 (1974) (citation omitted).

Before the 1974 Amendments, FOIA simply had adopted the APA's definition of agency: "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 551(1).

**2.** CEQ also admitted in litigation that it was an "agency," but not when it acted in its capacity of advising and assisting the President. *Pacific Legal Foundation*, 636 F.2d at 1263. We rejected this on-again, off-again approach to FOIA in *Ryan v. Department of Justice*, 617 F.2d 781, 788–89 (D.C.Cir.1980).

Task Force's advice or recommendation responsibilities to the President, but rather on its interaction with the agencies. The government responds that the directions given to the agencies merely "assisted" the President because the President himself cannot issue every specific order to the departments and agencies. According to the government, appellee's argument would read "assist" out of *Soucie* and *Kissinger*'s "advise and assist" test, and would limit its exemption to bodies that only advise the President. The government also contends that the Task Force did not exercise sufficient independent authority—independent from the President—to qualify as an "agency" under the Act. It was no different than several presidential assistants acting together or than the President's cabinet. And the government emphasizes that the Vice President—a separate constitutional officer who could not be thought of as an "agency"—headed the Task Force. Finally, the government distinguishes our prior cases because, unlike the OST, the CEQ, or even the CEA, the Task Force never received any delegated authority from Congress.

The core of the dispute between the parties, then, turns on the *degree* of independence from the President the Task Force exercised in its relations with the rest of the executive branch. Was the Task Force, in *Soucie*'s words, "substantially independent," or was its function "solely to advise and assist" the President? The latter phrase is not easy to apply literally. Every action taken by any executive branch official can be described as "assisting" the President. On the other hand, the line cannot be drawn to include all those who direct others in the executive branch because, contrary to the legislative history and *Kissinger*, under that approach the White House staff would be an agency. We can assume, however, that Congress

intended the phrase "solely to advise and assist" the President to refer to entities whose characteristics and functions were similar to those of the President's immediate personal staff. :

■ Thus, when we apply *Soucie* to those who help the President supervise others in the executive branch, we think it is necessary to focus on three interrelated factors. We must ask how close operationally the group is to the President, what the nature of its delegation from the President is, and whether it has a self-contained structure. Proximity to the President, in the sense of continuing interaction, is surely in part what Congress had in mind when it exempted the President's "immediate personal staff" without requiring a careful examination of its function.[3] *See* H.R.Rep. No. 1380, 93d Cong., 2d Sess. 14 (1974). Therefore, the other units in the Executive Office, which are exempted because they "advise and assist the President," would be those whose characteristics are similar to the White House staff—one of which is proximity to the President.[4]

Closely related to the proximity factor is the nature of the delegation. The greater the scope of the delegation—which also usually implies less continuing interaction with the President—the more independence an entity will exercise. Thus, *Rushforth* held that the CEA was not an agency because, unlike CEQ, CEA did not possess any delegated regulatory authority to supervise agencies. Similarly, we recently determined that the White House Counsel's Office is not a FOIA agency. *National Sec. Archive v. Archivist of the United States*, 909 F.2d 541, 545 (D.C.Cir.1990). Unquestionably, the Chairman and members of the CEA and the White House counsel, like other senior White House officials close to the President, often give *ad hoc* directions to executive branch person-

---

**3.** The President's immediate personal staff, we assume, would encompass at least those approximately 400 individuals employed in the White House Office. *See* Reorganization Plan No. 1 of 1977, 5 U.S.C.App. 1, § 2. But as we recognized in *Rushforth*, the sole function test must be applied to *other* units in the Executive Office of the President.

**4.** "If the OST's sole function were to advise and assist the President, that might be taken as an indication that the OST is part of the President's staff and not a separate agency." *Soucie*, 448 F.2d at 1075.

nel. But when it occurs, it is assumed that they merely are passing on the President's wishes.

 In this case, appellee contends that the Task Force exercised regulatory authority over executive branch agencies. That is not accurate. Executive Order 12,-291 did not authorize either the Vice President or the Task Force, *qua* Task Force, to give directions to the executive branch. Instead, the OMB Director took up that responsibility under the Executive Order. For example, the Order says the Director of OMB shall have the authority to designate major rules "subject to the direction of the Task Force." Exec. Order No. 12,-291, § 3(b). The Director's other powers of review are only "subject to the direction of the Task Force." *Id.* § 3(e)(1), § (3)(i), § 5(b), § 6(a), § 6(b). The Associate Director of OMB for OIRA also served as Executive Director of the Task Force, but the government does not even claim that his (or the Director's), written policy instructions to the agencies were "Task Force" documents. As the government concedes, those documents, like document eight, are OMB records subject to FOIA. Insofar as appellee is correct in arguing that the body which provided direction to the executive branch is an agency under FOIA, that body is OMB, not the Task Force.

A careful reading of the Executive Order—which, of course, is the most important indication of the Task Force's role—reveals that whatever significant authority the President delegated he gave to the Director of OMB. Although the appellee and the dissent blend together the responsibilities of both OMB and the Task Force, they are analytically quite distinct. The dissent's list of the "Task Force's" responsibilities, dissent at 1294, is, therefore—like Homer's catalogue of ships—exhaustive but quite beside the point. Also irrelevant, at least to this case, is the dissent's concern that OMB's directives implementing the Executive Order should be exposed, *see*

dissent at 1313 n. 26. Despite OMB's closeness to the President, it is a permanent agency with a significant staff and broadly delegated powers, and so it unquestionably falls under FOIA.

It remains to be determined, however, whether the Task Force's role, vis-a-vis the OMB Director and cabinet or agency heads, made the Task Force a FOIA agency. The Executive Order did give the Task Force the responsibility for providing "guidance" and "direction" to the OMB Director, and the authority to resolve disputes between agencies and OMB "or [to] ensure that they are presented to the President." Exec.Order No. 12,291, § 3(e)(1). In that respect, however, the Task Force theoretically was positioned between the OMB Director and the President, placing the Task Force only a hair's breadth from the President. After all, the OMB Director, whose duties include aiding the President in managing the entire executive branch, is (as the dissent recognizes at 1307) the cabinet officer functionally, if not actually, closest to the President. The cabinet members serving on the Task Force, therefore, were acting not so much as the heads of their departments, but rather as the functional equivalents of assistants to the President ("immediate personal staff" are, it will be recalled, exempt from FOIA coverage). Furthermore, notwithstanding appellee's proffer of press releases—which is not reliable evidence—we see no indication that the Task Force, *qua* Task Force, directed anyone, including OMB, to do anything.[5] When the Task Force wished directions given to the executive branch, it found it necessary to advise the President to put such instructions in another Executive Order. (*See* Executive Order No. 12,498 § 1(d)). If the Task Force exercised all the powers which the dissent attributes to it, we would expect the Task Force to have generated more than only the seven documents that fell within appellee's FOIA request.

Nor does the dispute resolution mechanism of the Executive Order indicate that

---

**5.** It is interesting to note that in the beginning of the dissent OMB and the Task Force are mentioned together, but gradually OMB fades behind the "curtain" (*see* dissent at 1309 n. 18), and by the end of the opinion the Task Force emerges alone.

the Task Force, in dealing with the OMB Director (or the agency heads), acted with *substantial* independence. Despite the option granted to the Task Force to resolve disputes or bring them to the President, it is rather hard to imagine that the OMB Director, or any other head of a department or agency who *reports directly* to the President, would acquiesce in a Task Force decision that was thought not to represent directly and precisely the President's opinion. It seems implicit that the Vice President and the other members of the Task Force were not expected to resolve disputes themselves, *without presenting those disputes to the President,* unless they already knew the President's views on the exact issue. This, of course, means the Task Force was not expected to act with significant independence. Not surprisingly, there is no documented example of an agency appealing an OMB decision to the Task Force.[6]

Appellee suggests, however, that the Vice President's chairmanship of the Task Force gave the Task Force added clout and independent authority. The government responds that the Vice President's role made the Task Force even less plausible an agency under FOIA. Because of his constitutional position, according to the government, we must treat the Vice President and his staff in the same manner as the President and his staff. Indeed, appellee conceded at oral argument that if the Vice President alone held the exact duties of the Task Force, the Vice President would not be an agency for purposes of FOIA. *See*

*Armstrong v. Bush,* 924 F.2d 282, 286 n. 2 (D.C.Cir.1991) (President and Vice President subject only to Presidential Records Act, not Federal Records Act).[7]

In any event, despite the Vice President's rank, we do not believe his status as Chairman lent the Task Force any authority independent of the President. The Vice President is the only senior official in the executive branch totally protected from the President's removal power. *See Bowsher v. Synar,* 478 U.S. 714, 721–27, 106 S.Ct. 3181, 3185–88, 92 L.Ed.2d 583 (1986) (presidential power to remove executive branch officials crucial to presidential control). Presidents are, for that reason, reluctant to delegate real supervisory authority over the executive branch to the Vice President. As Professor Rossiter has observed, it is dangerous for the President to give the Vice President administrative responsibilities "because the Vice President is not subject to removal" and so could become "a dagger aimed constantly at the precious unity of the executive power." C. ROSSITER, THE AMERICAN PRESIDENCY 140 (2d ed. 1960); *see also Report of the Task Force* in A HEARTBEAT AWAY: REPORT OF THE TWENTIETH CENTURY FUND TASK FORCE ON THE VICE PRESIDENCY 64–66 (1988). No matter how close the personal and functional relationship between a Vice President and President, the former, mindful of traditional presidential concerns, presumably will not express direction to others in the executive branch unless his view is shared by the President. The Vice President's chairman-

---

**6.** The dissent cites an article in an obscure law review (not in the record) as evidence that the Task Force actually exercised the power to resolve a dispute between OMB and OSHA. Dissent at 1308–09 n. 17. The law review article claims that the Task Force's dispute resolution authority was rarely invoked and that the OSHA example was the only publicly known example of its exercise. Olson, *The Quiet Shift of Power: Office of Management & Budget Supervision of Environmental Protection Agency Rulemaking Under Executive Order 12,291,* 4 VA.J.NATURAL RESOURCES L. 1, 44 & n. 210 (1984). But close examination of the law review article's sources shows that it is unlikely any such incident took place. At hearings on OMB's authority under Exec. Order 12,291, the representative of the

AFL–CIO claimed that the Task Force had intervened in an OMB–OSHA dispute to uphold OSHA's position. Nonetheless, the representative then conceded that "none of the intergovernmental exchanges ... are documented." *Hearings on OMB Control of OSHA Rulemaking: Hearings Before a Subcomm. of the House Comm. on Gov't Operations,* 97th Cong., 2d Sess. 22 (1982). In discussing the OMB–OSHA conflict, the head of OMB at the time merely noted that the Task Force had reviewed the matter but made no mention of an alleged appeal or a resolution of a dispute. *Id.* at 318.

**7.** We do not have to decide whether the Vice President could ever be the head of a FOIA agency.

ship, thus, cuts against appellee's argument.

The Task Force's lack of a separate staff further indicates the absence of independent authority. In *Soucie*, we implied that structure and function, for purposes of defining agency, are interrelated. "If the OST's sole function were to advise and assist the President, that might be taken as an indication that the OST is part of the President's staff and not a *separate* agency." *Soucie*, 448 F.2d at 1075 (emphasis added). FOIA, by declaring that only "establishments in the executive branch" are covered, 5 U.S.C. § 552(e), requires a definite structure for agency status. And just as the intended exemption for the President's personal staff leads us to believe that proximity to the President is relevant so, too, the exemption suggests the importance of structure. For another characteristic of the President's immediate staff is its lack of a firm structure.

It could be said that, in one sense, the President "established" the Task Force, albeit by informal presidential direction, and then later delegated to it certain functions under Executive Order 12,291. But the Task Force was simply a partial cabinet group. The President does not create an "establishment" subject to FOIA every time he convenes a group of senior staff or departmental heads to work on a problem. Furthermore, the Task Force operated out of the Vice President's office without a separate staff, borrowing OMB personnel as needed. We doubt that any individual or group, within the Office of the President, without a separate staff, can be regarded as an "establishment" with independent authority. Veterans of bureaucratic wars will insist that the typical officer in

the executive branch is virtually powerless without a staff. And it is often said that presidential appointees are captured relatively quickly by their staffs—in other words, they are weaned away from presidential influence and made, in that sense, more independent. Whether these maxims are true or not, the Task Force's lack of a separate staff is a strong indicator that it was neither an "establishment" nor an independent actor in the executive branch.

The dissent at 1312 n. 24 suggests that the Executive Order might distinguish this case from one in which the President merely instructs several cabinet officers, or a group of White House assistants (or perhaps the Chief of Staff), to perform the same duties. But that distinction appears inconsistent with the dissent's insistence that the crucial factor is the *function* performed by the entity in question. As we understand our colleague's reasoning, if the President had set up this exact structure by memorandum, or even by oral direction, the Task Force would still be a FOIA agency. So the Executive Order is, according to the dissent's logic, mere surplusage. *See* dissent at 1303 n. 9; *see also* dissent at 1301.

█ We do not think much should turn on whether the President delegates authority to a White House group by memorandum or by Executive Order.[8] Otherwise, of course, a future President could avoid creating an agency under FOIA by informally delegating authority to an "establishment" in the Executive Office. As we have indicated, however, the structure of the group is important in determining its relative independence from the President. Function is crucial, but, like the architect

---

**8.** The Executive Order carefully stated that its purpose was only for internal management and that it created no private rights. As such, it is doubtful that it had any legal significance. An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not, for instance, subject to judicial review. *Michigan v. Thomas*, 805 F.2d 176, 187 (6th Cir.1986); *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 235–36 (8th Cir.1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). The Order seems no different than a presidential memorandum delegating certain tasks to the Vice President and to some cabinet officers or to the President's own staff. If agency heads appealed directly to the President over a disagreement with OMB (or the Task Force) on regulatory matters—without giving the Task Force its opportunity to resolve disputes—it surely would not have been thought "illegal." Certainly, the President, if he wished, could have ignored his own Task Force.

Louis Sullivan, we believe that form follows function.

■ The dissent acknowledges that the President has a constitutional duty to see that the laws are faithfully executed, and, therefore, a duty to oversee the regulatory policies produced by the departments and agencies. *See Sierra Club v. Costle,* 657 F.2d 298, 406 (D.C.Cir.1981); *Public Citizen v. Burke,* 843 F.2d 1473, 1477–78 (D.C.Cir.1988). Nonetheless, the dissent insists that the choice the President makes between various techniques to perform this task can have enormous consequences under FOIA. If he performs this role alone, meeting with his cabinet officers and agency heads "face to face," as our colleague puts it, he may keep the discussion entirely confidential (so long as the agency rule is justified by the record), *Sierra Club* at 657 F.2d at 407. But should he use a group of cabinet officers and perhaps White House staff in some sort of committee like the Task Force to screen the regulatory issues, he risks creating a FOIA agency. That approach empties the word "assist" in the *Soucie* test of all meaning.

The dissent does not dispute, however, dissent at 1311–12 & n. 23, that if the President used *only* White House staff in this manner, he would avoid FOIA altogether. In other words, if the President had set up this exact Task Force structure (including OMB's role) in this exact fashion (by Executive Order), but used senior White House staff personnel as his Task Force members, FOIA would not apply. If, on the other hand, a President employed his entire cabinet as his Task Force, the dissent insists that FOIA would apply. To be sure, the dissent does doubt that a President would ever delegate true independent authority to his cabinet.[9] In light of that sound observation, however, it is difficult to understand why the dissent strains to construe the Executive Order as granting "substantial independent" authority to a partial cabinet group. And the dissent's

position leaves open the obvious question: how would we treat an analogous Task Force composed partially of senior White House staff and cabinet officers?

The dissent appears to recognize that the structure employed at least bears on the question whether the President has delegated independent authority. Dissent at 1311 n. 22. It would appear, then, that the line the dissent draws in this case is governed more by fortuitous history than by a logical principle. The dissent asserts over and over that in this case—structure aside—the Task Force was given "substantial independent" authority. But it is unclear just what factors distinguish this case from a multitude of similar arrangements that a President could use to accomplish the exact same ends—arrangements that the dissent is unwilling to categorize as covered by FOIA or not. *See* dissent at 1311 n. 23. As for our dissenting colleague's concerns about the President's ability to "shroud [the Task Force's] actions in absolute secrecy," dissent at 1313, it is worth noting that when a President openly discloses exactly how he will review regulations—as, for example, by a Task Force mechanism—it might well be thought more forthright than the behind the scenes *ad hoc* approach sanctioned in *Sierra Club.*

In sum, the Task Force was not a body with "substantial independent authority" to direct executive branch officials. The various cabinet members of the Task Force were unquestionably officers who wielded great authority as heads of their departments. But there is no indication that when acting as the Task Force they were to exercise substantial independent authority, nor in fact, did they do so. Put another way, the whole does not appear to equal the sum of its parts. The cabinet officers were acting, in truth, just as would senior White House staffers. We think the dissent's characterization, moreover, of the Task Force as the "people" behind the scenes [or curtain?] "who call the shots" is

---

9. The old story about President Lincoln overruling his entire cabinet is instructive. After receiving the unanimous vote of his cabinet against a certain decision, Lincoln announced:

"The vote has been taken. Seven noes, one aye—the ayes have it." *See* R. Fenno, The President's Cabinet 29 (1963).

not supported by the record in this case. The Task Force seems to have been merely a committee which convened periodically both to bring together the views of various cabinet department heads concerning significant proposed regulations, and to shape for the President's decision intra-agency disputes which, in truth, only he can resolve. As such, the Task Force fell within the *Soucie* test as an entity "whose sole function is to advise and assist" the President.

\* \* \* \* \* \*

Accordingly, for the reasons stated, we conclude that the Task Force was not an agency under FOIA. Having decided the issue certified to us, we remand the case to the district court.

*It is so ordered.*

WALD, Circuit Judge, dissenting:

A close examination of the Freedom of Information Act ("FOIA" or "the Act") and its legislative history, the governing FOIA precedent, and the record of the Task Force's creation and functions demonstrates that the Task Force falls within the Act's definition of an "agency." The majority opinion does not give due weight either to the applicable law or to the actual role the Task Force played in the President's regulatory reform program. Accordingly, I dissent.

## I. BACKGROUND

### A. *Legislative History*

Congress in 1974 amended the Freedom of Information Act to broaden the definition of "agency" to encompass more entities "which perform governmental functions and control information of interest to the public," H.R.REP. No. 876, 93d Cong., 2d Sess. 8 (1974), U.S.Code Cong. & Admin.News 1974, 6267, 6274, *reprinted in* FOIA SOURCE BOOK: LEGISLATIVE HISTORY, TEXTS, AND OTHER DOCUMENTS, COMMITTEE ON GOVERNMENT OPERATIONS, U.S. HOUSE OF REPRESENTATIVES 121, 128 (1975) [hereinafter FOIA SOURCE BOOK]. These amendments expanded the definition of an "agen-

cy" expressly to include an "establishment ... in the Executive Office of the President." 5 U.S.C. § 552(e). As the majority points out, the House/Senate conference committee, citing this court's decision in *Soucie v. David*, 448 F.2d 1067 (D.C.Cir. 1971), clarified that "Executive Office of the President ... is not to be interpreted as including the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." H.R.REP. No. 1380, 93d Cong., 2d Sess. 14 (1974), *reprinted in* FOIA SOURCE BOOK 219, 233 [hereinafter Conference Report]. What the majority overlooks, however, is the additional and quite specific guidance Congress provided for determining when an establishment in the Executive Office of the President is an "agency" for FOIA purposes.

Most significantly, Congress contemplated that "agency" would encompass entities, like the Task Force, which are created solely by executive order. The statutory language expanding the definition of an agency originated in the House bill, H.R. 12471. In its report accompanying that legislation, the House Committee on Government Operations stated:

> For the purposes of this section, the definition of "agency" has been expanded to include those entities which may not be considered agencies under [the APA, 5 U.S.C. § 551(1)], but which perform governmental functions and control information of interest to the public. The bill expands the definition of agency for purposes of [FOIA]....

> The term "establishment in the Executive Office of the President," as used in the amendment, means such functional entities as the Office of Telecommunications Policy, the Office of Management and Budget, the Council of Economic Advisers, the National Security Council, the Federal Property Council, and other similar *establishments which have been or may in the future be created* by Congress through statute or *by Executive order.*

H.R.REP. No. 876, 93d Cong., 2d Sess. 8 (1974), U.S.Code Cong. & Admin.News 1974, 6274, *reprinted in* FOIA SOURCE BOOK 121, 128 (emphases added).[1]

Additionally, the legislative history indicates that in focusing on "functional entities" within the Executive Office of the President, Congress intended to exclude from the FOIA the President's own records. An exchange during the floor debate on H.R. 12471 between Representative Moorhead, chair of the Foreign Operations and Government Information Subcommittee of the House Committee on Government Operations, and Representative Erlenborn, the ranking minority member of that committee, illustrates this:

> Rep. Erlenborn: The question has been asked by Members on this side of the aisle as to the meaning of two definitions of agencies to include the Executive Office of the President.
>
> I want to ask the gentleman if it is not correct, as it states in the report of the committee, that the term "establishment in the Executive Office of the President" as it is contained in this bill means functional entities, such as the Office of Telecommunications Policy, the Office of Manager of [sic] the Budget, the Council of Economic Advisers and so forth; *that it does not mean the public has a right to run through the private papers of the President himself?*

Rep. Moorhead: No, definitely not. I think the report is crystal clear on that. I thank the gentleman for bringing it up.

120 CONG. REC. 6806 (1974), *reprinted in* FOIA SOURCE BOOK at 241 (emphasis added).

From the foregoing, we can surmise congressional intent on the definition of an agency to the following extent: It includes establishments within the Executive Office of the President, excepting only the President's "immediate personal staff" or units whose "sole function" is to advise and assist the President.[2] It encompasses entities created by executive orders, with no requirement that the entity receive direct congressional approval or appropriations. And it shields the President's own records.

### B. *Precedent*

In the oft-cited case of *Soucie v. David,* 448 F.2d 1067 (D.C.Cir.1971), this court interpreted the APA and the FOIA to confer agency status "on any administrative unit with *substantial independent authority* in the exercise of specific functions." *Id.* at 1073 (emphasis added). We determined that the Office of Science and Technology ("OST") satisfied this test "[b]y virtue of its independent function of evaluating federal programs...." *Id.* at 1075.

This court has applied the *Soucie* "sole function" test three times to entities within the Executive Office of the President; two of the three entities were found to be

---

1. Although this court has subsequently concluded that one of the House's illustrative examples of a "functional entity," the Council of Economic Advisors, falls within the *Soucie* exception for units whose "sole function" is to advise and assist the President, *Rushforth v. Council of Economic Advisors,* 762 F.2d 1038 (D.C.Cir.1985), this does not undercut the congressional determination that entities created by executive orders can be "agencies" under the FOIA. After expressly providing that its substitute *"follow[ed] the House bill"*—the bill that defined "agency" to include establishments within the Executive Office of the President—the Conference Report merely imposed the additional requirement that this term be "interpreted" according to the *Soucie* test. CONF.REP. at 13, 14 (emphasis added).

2. It is worth noting that while the Senate bill did not expressly refer to entities within the

Executive Office of the President, the Senate Committee on Government Operations contemplated that they would be included as "agencies" under the *Soucie* test:

> Section 3 expands on the definition of agency as provided in section 551(1) of title 5 [the APA]. That section defines "agency" as "each authority (whether or not within or subject to review by another agency) of the Government of the United States other than Congress, the courts, or the governments of the possessions, territories, or the District of Columbia." This definition has been broadly interpreted by the courts as including "any administrative unit with the substantial independent authority in the exercise of specific functions," which in one case was held to include the Office of Science and Technology. *Soucie v. David,* 448 F.2d 1067, 1073 ( [D.C.Cir.] 1971).

S.REP. No. 854, 93d Cong., 2d Sess. 32 (1974), *reprinted in* FOIA SOURCE BOOK at 153, 185.

"agencies."[3] In its first application of the *Soucie* test, this court held that the Office of Management and Budget ("OMB"), an entity within the Executive Office of the President,[4] was an "agency" under the Administrative Procedure Act, 5 U.S.C. § 551(1) and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332. *Sierra Club v. Andrus*, 581 F.2d 895 (D.C.Cir.1978).[5] The court held that, although the OMB's primary statutory duty was to prepare the President's budget proposal for submission to Congress, it was an agency under the "sole function" test. *Id.* at 902. The court noted that the preparation of the budget was "an aid to Congress as well as an instrument of presidential and policymaking control over the executive bureaucracy," and that the OMB had other "management, coordination, and administrative functions." *Id.* The court also found that Congress "signified the importance of OMB's function, over and above its role as presidential advisor," when it provided for Senate confirmation of the OMB's director and deputy director. *Id.*

In 1980, this court applied the *Soucie* test to determine that the Council on Environmental Quality ("CEQ"), a unit within the Executive Office of the President, was an "agency" for purposes of the Government in the Sunshine Act, 5 U.S.C. § 552b(b), which adopted the FOIA definition of an agency. *Pacific Legal Foundation v. Council on Environmental Quality*, 636 F.2d 1259 (D.C.Cir.1980). The CEQ was created by the NEPA, which authorized it to advise the President in preparing his annual environmental policy report; prepare studies on environmental conditions and trends for the President; review and appraise federal programs that affect the environment and make recommendations to the President about those programs; and recommend national environmental policies to the President. 42 U.S.C. § 4344. The CEQ's mission was later expanded by several executive orders, which made it responsible for overseeing activities of federal agencies; for coordinating federal programs related to environmental quality and for issuing guidelines to federal agencies for preparing Environmental Impact Statements; for issuing regulations to federal agencies for implementing the procedural requirements of the NEPA; and for publishing and revising the national contingency plan for removing oil and hazardous substances from navigable waters. *Pacific Legal Foundation*, 636 F.2d at 1262. Relying on the Supreme Court's determination in *Soucie* that the OST's authority to evaluate federal programs was sufficient to qualify it as an agency, this court looked to the CEQ's executive order authority to evaluate federal programs and likewise found it sufficient to qualify the CEQ as an agency. *Id.* at 1263.

The only entity within the Executive Office of the President that this court has found *not* to be an agency under the "sole function" test is the President's Council of Economic Advisors ("CEA"). *Rushforth v. Council of Economic Advisors*, 762 F.2d 1038 (D.C.Cir.1985). The CEA was created by statute, housed in the Executive Office of the President, and authorized to, among other things, advise and assist the President in formulating his economic policies; gather information concerning economic developments and trends; and appraise federal programs and activities in light of

---

3. We did not apply the *Soucie* "sole function" test to the White House Counsel, but instead treated it as part of the President's "immediate personal staff." *See National Security Archive v. Archivist of the United States*, 909 F.2d 541, 545 (D.C.Cir.1990).

4. The OMB itself was a presidential creation. *See* Reorganization Plan No. 2 of 1970, 35 Fed. Reg. 7959 (1970), *reprinted in* 31 U.S.C. § 501 note (1988).

5. The APA defines agency as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 551(1). Although the *Sierra Club* court was determining agency status under the APA, and not under the FOIA, its application of the *Soucie* test is nonetheless instructive here. Obviously, it applies the appropriate test, and moreover, since the FOIA definition is an expansion of the APA definition, *see* H.R.Rep. No. 1380, 93d Cong., 2d Sess. 13 (1974), *reprinted in* FOIA Source Book at 219, 231, any entity determined to be an agency under the APA should easily qualify as an agency under the FOIA.

the President's economic policies. 15 U.S.C. § 1023. The court noted that the CEA and the CEQ, which the court had earlier determined to be an agency, were created by statutes that were "for all practical purposes, identical." *Rushforth*, 762 F.2d at 1041. Nonetheless, Judge Starr, writing for the panel, distinguished the CEA from the CEQ on the ground that the latter's statutory functions had been expanded under several executive orders. *Id.* These expanded—and apparently dispositive—functions included coordinating federal regulatory policy, issuing guidelines for agencies to prepare required statements, and promulgating regulations for implementing the procedural provisions of a key environmental law. *Id.* See also *id.* at 1042 (the CEQ's "expanded duties ... took [it] out of the realm of entities the sole function of which is to advise and assist the President"). Judge Starr also distinguished the CEA from the OST, found in *Soucie* to be an agency, by the OST's ability to "take direct action." *Id.* at 1041.

This court most recently applied the *Soucie* test not to an entity within the Executive Office of the President, but to the Defense Nuclear Facilities Safety Board, an "independent establishment in the executive branch." 42 U.S.C. § 2286(a). In *Energy Research Foundation v. Defense Nuclear Facilities Safety Board*, 917 F.2d 581 (D.C.Cir.1990), we held that the Board was an agency under the *Soucie* test, based on four functions demonstrating that the Board did "considerably more than merely offer advice": it conducted investigations; formally evaluated the Energy Department's standards relating to defense nuclear facilities; "force[d] public decisions about health and safety"; and possessed the authority to impose reporting requirements on the Secretary of Energy. *Id.* at 584–85. The court found that, since "[e]valuation plus advice was enough to make the Office of Science and Technology an 'agency' in *Soucie*," and the CEQ an agency in *Pacific Legal Foundation*, the Board's evaluation and other functions more than fulfilled the *Soucie* test. *Id.*

These cases teach us that whether an establishment is an "agency" for FOIA purposes hinges primarily on its functions. *See, e.g., Rushforth*, 762 F.2d at 1043 n. 7 ("it is, at bottom, its function that determines an entity's status for FOIA purposes"); *see also Ryan v. Department of Justice*, 617 F.2d 781, 788 (D.C.Cir.1980) (agency status depends on "general nature and functions" of a particular unit). Specifically, agency status does not depend on where within the Executive Office of the President (but outside the Office of the President, *see infra* 1309–10, 1311 n. 23) the establishment is located, *see Rushforth*, 762 F.2d at 1041 (while the CEA and the OST were "located, hierarchically, in the same position ..., there [was] no indication that [their] functional roles ... were the same; and critically, it was the *functional role* of the agency on which *Soucie* turned") (emphasis added), nor on congressionally granted authority, *see id.* (CEA and CEQ had virtually identical authorizing statutes). Thus, determining whether the Task Force is an agency requires a careful examination of both its authorized and actual functions.

## II. APPLICATION OF THE LAW TO THE TASK FORCE

Turning now to the Task Force, it is obvious that both its structure and its authorized and actual functions satisfy all statutory and case law requirements of an agency under the FOIA.

### A. *The Task Force as an Establishment*

First, the Task Force was an "establishment" within the Executive Office of the President. The legislative history of the FOIA's expanded definition of "agency" makes clear that entities created by executive order are sufficiently "established" to fall within its ambit. H.R.REP. No. 876, 93d Cong., 2d Sess. 8 (1974), U.S.Code Cong. & Admin.News 1974, 6274, *reprinted in* FOIA SOURCE BOOK at 121, 128. The majority, however, in its inquiry into the nature of the delegation of authority to the Task Force, completely overlooks the formality and authority of the delegation provided by Executive Order No. 12,291, saying that

the President established the Task Force by "informal presidential direction" and suggesting that it lacked a sufficiently "definite structure" to qualify for agency status. Majority opinion ("Maj. op.") at 1296. Although the President announced the formation of the Task Force before he issued Executive Order No. 12,291, it was the Executive Order that spelled out the Task Force's mission, responsibilities and relationship to other entities in the executive branch, including those within the Executive Office of the President. Short of a

reorganization plan requiring congressional approval, the executive order offers the most formal means available to the President to create or assign responsibility to an entity within the Executive Office of the President.[6] Without deciding whether an entity in the Executive Office of the President without executive order authority can ever be an agency,[7] it seems clear that an entity whose role is established by an executive order is a sufficient "establishment" to qualify as an agency, provided it passes *Soucie's* "sole function" test.[8] The major-

---

**6.** The government acknowledges that an executive order remains in effect until formally rescinded. Letter from Appellant to Clerk of Court, October 2, 1992, at 4. *See Feliciano v. United States,* 297 F.Supp. 1356, 1358, 1359 (D.P.R.1969), *aff'd,* 422 F.2d 943 (1st Cir.), *cert. denied,* 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970). An executive order is, for many purposes, a form of presidential "law." *See, e.g., Old Dominion Branch No. 496 v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (managerial executive order lacking specific statutory authority can be "relevant federal law" for purposes of Supremacy Clause); *In re Neagle,* 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890) (executive directive issued by the Attorney General was a "law of the United States" under the habeas corpus statute). *See generally* John E. Noyes, *Executive Orders, Presidential Intent, and Private Rights of Action,* 59 Tex.L.Rev. 837, 839 (1981) (executive orders are "the most important type of 'Presidential legislation'").

While an executive order that merely implements a personal policy of the President may not be enforceable in a private civil action, *Independent Meat Packers Ass'n v. Butz,* 526 F.2d 228, 236 (8th Cir.1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976); *Manhattan–Bronx Postal Union v. Gronouski,* 350 F.2d 451, 452 (D.C.Cir.1965), *cert. denied,* 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966), at least one commentator has concluded that Executive Order No. 12,291 nonetheless binds the agencies under the doctrine of the unitary executive, which makes the rule of the executive the rule of the agency, and the doctrine that agencies must follow those rules that go beyond mere regulation of internal housekeeping. Peter Raven–Hansen, *Making Agencies Follow Orders: Judicial Review of Executive Order 12,291,* 1983 Duke L.J. 285.

**7.** At least one entity outside of the Executive Office of the President that was created without statutory or executive order authority has been determined an agency for FOIA purposes. *See Niemeier v. Watergate Special Prosecution Force,* 565 F.2d 967, 969 n. 2 (7th Cir.1977) (Watergate Special Prosecution Force, whose authority was delegated by the Attorney General through a formal Department of Justice regulation, was an

agency under FOIA because it "exercised the requisite independent authority in exercising specific functions").

**8.** To the extent that the majority's assertion that the FOIA requires a "definite structure," Maj. op. at 1296, suggests that the statute requires a specific form or structure, I must disagree. The choice of the word "establishment," in lieu of board, division, office or some other term, makes the FOIA applicable to a broad range of structures. *See Armstrong v. Bush,* 924 F.2d 282, 289 (D.C.Cir.1991) (in the APA, "Congress thought it 'necessary to define agency as 'authority' rather than by name or form, because of the present system of including one agency within another or of authorizing internal boards or 'divisions' to have final authority'") (quoting Senate Judiciary Committee Print, *reprinted in* Legislative History of the Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. 13 (1946)). Therefore, I believe that while the general structure of an entity is relevant to whether it satisfies the statutory requirement of an "establishment," its specific form or structure is not dispositive of its agency status.

No less novel or puzzling is the majority's requirement that a FOIA agency have a "self-contained structure." Maj. op. at 1293. Does this suggest that no interagency task force, even if created by statute, heavily staffed, and armed with significant independent authority, could ever be a FOIA agency? Or is it intended to exclude any entity that relies on another body for staff or other support services? Whatever the majority intends, this requirement appears incompatible both with the legislative intent to expand the definition of agency and with this court's heretofore largely functional inquiry under *Soucie.*

Perhaps most curious is the majority's analogy to the structure of the White House Office, or the President's "immediate personal staff." The majority first observes that the President's "immediate personal staff," which has been exempt from FOIA, lacks a "definite structure." (I'll assume for purposes of argument that this is true.) It then suggests that, because the White

ity is surely correct that the President "does not create an 'establishment' subject to FOIA every time he convenes a group of senior staff or departmental heads to work on a problem." Maj. op. at 1296. This is not, however, a question of the President calling in his chief of staff and the Director of OMB, or yet his entire cabinet, for a strategy session. Instead, it is a matter of the creation of a separate functional entity to which the President—by an executive order—delegated significant independent authority to act on a continuing basis without his ongoing involvement. *See infra* at 1304–07.

The potential importance of executive order authority is evident in our opinion in *Rushforth*.[9] There we determined that the President's delegation of authority, through an executive order, was alone enough to make an entity an "agency":

> [A]ppellant mounts a policy argument that the President should not be allowed to take an entity out of, or place an entity in, FOIA agency status by the mere expedient of adding or eliminating duties. This argument is unavailing. Congress' intent would appear to have been to require entities having authority and the ability to act, but not those whose sole function was to render advice and assistance to the President, to be subject to FOIA. If the President adds duties to an entity which bring it outside the sole-function test, Congress would want the entity covered.

House staff possesses this characteristic, this characteristic is relevant to the FOIA inquiry. Maj. op. at 1296. By this same reasoning, the majority could claim that, because the White House Office has upwards of 400 employees, then only entities that have 400 employees can be agencies under FOIA. The majority does not explain how or why such fortuitous characteristics of the President's "immediate personal staff" can or should become relevant to our "sole function" inquiry.

9. Of course, *how* a President delegates to an entity is not as important as *what* he delegates. Here, he delegated significant authority to act independently. While *Rushforth* demonstrates that delegation by an executive order can, in some circumstances, be *sufficient* to establish an agency, we are not called on here to decide if

*Rushforth*, 762 F.2d at 1042 n. 5. This confirms that the "independent" authority that takes an agency outside the sole function test can be granted by the President, as well as the Congress. *See also id.* at 1042 (CEA lacked the "independent" authority enjoyed by the CEQ—authority granted by an executive order); *id.* at 1041–43 (emphasizing that the inquiry is on an entity's functions, not its genesis).[10]

The majority also expresses its "doubt that any individual or group, within the Office of the President, without a separate staff can be regarded as an 'establishment' with independent authority." Maj. op. at 1296. This new "requirement" of the majority that an agency have a separate staff is at odds with our precedent focusing on how an entity functions, not where it gets the resources to perform those functions. *See Rushforth*, 762 F.2d at 1041 ("critically, it was the functional role of the agency on which *Soucie* turned"); *id.* at 1043 n. 7 (Senate confirmation of CEA members not given great weight, as "the nature of the appointment" did not "speak[ ] to the function of the CEA"). Nor does this staff "requirement" appear anywhere in the FOIA's language or legislative history. Indeed, when Congress indicated that an entity created by an executive order could be a FOIA agency, it had to have contemplated that the President might exercise his broad powers to structure the Executive Office of the President to staff the new entity as he saw fit, whether by transferring staff to it or by designating personnel of other Executive Offices to provide needed support. It

such authority is *necessary*, and it bears repeating that I have nowhere suggested that it is. *Cf.* Maj. op. at 1296. In this regard, I agree with the majority that a President should not be able to avoid FOIA merely by delegating authority informally. Maj. op. at 1297. In this particular case, however, Executive Order No. 12,291 happens to provide relevant evidence for both parts of our inquiry: first, whether the Task Force was an "establishment," and second, how it functioned. In another case, however, an entity without executive order authority might well be deemed a FOIA agency.

10. In light of the foregoing discussion, I am puzzled by the majority's assertion that I view Executive Order No. 12,291 as mere "surplusage." Maj. op. at 1296.

is clear that, by permitting FOIA agencies to be formed by executive order, Congress foreswore any requirement that an agency's staff appear on a separate line in an authorization or appropriation bill.

Even in case law under the APA, whose definition of "agency" is less expansive than the FOIA's, there is no such "separate staff" requirement. Instead, the APA inquiry into agency status is much like the FOIA inquiry: focused on the functions of the entity, and flexible enough to encompass the "myriad organizational arrangements for getting the business of government done." *Washington Research Proj., Inc. v. HEW*, 504 F.2d 238, 246 (D.C.Cir. 1974) (citations omitted), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975). *See also Lee Constr. Co. v. Fed. Reserve Bank of Richmond*, 558 F.Supp. 165, 173 (D.Md.1982) (" 'The authority to act with the sanction of government behind it determines whether or not a governmental agency exists.' ") (*quoting Lassiter v. Guy F. Atkinson Co.*, 176 F.2d 984, 991 (9th Cir.1949)).

Staff capabilities may, of course, be relevant indicia of an entity's ability to take substantial independent action, *see Grumman Aircraft Engineering Corp. v. Renegotiation Bd.*, 482 F.2d 710, 715 (D.C.Cir. 1973), *rev'd on other grounds*, 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975), but ready access to staff support or, as in the case of the Task Force, direct delegation of authority effectively to direct OMB staff is the functional equivalent of a separate staff, as this case illustrates. In any event, it is clear, the majority's claims aside, that the Task Force was not "virtually powerless" without a separate staff. Maj. op. at 1296. Through its authority to direct the OMB Director and through the

service of the OIRA Administrator as Executive Director of the Task Force (reinforced by the political suasion of its high-powered membership), the Task Force had the staff of a powerful and effective agency at its disposal.[11]

### B. *The Task Force's Functions*

Turning to the second part of our inquiry, the Task Force clearly had functions beyond "advising and assisting the President," as this term has been construed in our case law. As the majority acknowledges, Executive Order No. 12,291 "is the most important indication of the Task Force's role...." Maj. op. at 1294. This Executive Order gave the Task Force "substantial independent authority," *Soucie*, 448 F.2d at 1073, charging it with the "direction" of a far-reaching regulatory reform program. The Task Force's directions were to be carried out by the Director of the OMB. Exec. Order No. 12,-291 §§ 3(b), 3(e)(1), 3(i), 5(b), 6(a), 6(b), 7(c), 7(g) and 8(b). The Task Force was to "direct" the OMB Director in performing the following functions: reviewing preliminary and final Regulatory Impact Analyses ("RIAs"), notices of proposed rulemaking, or final rules based on the requirements of the order, § 3(e)(1); monitoring agency compliance with the order, § 6(a)(8); designating a proposed or currently effective rule as a "major" rule subject to additional review and reporting requirements, §§ 3(b), 6(a), 7(c)(2); requiring reconsideration of major rules, § 7(c)(1); identifying duplicative, overlapping and conflicting rules and requiring interagency consultation to eliminate such duplication, overlap or conflict, § 6(a)(5); preparing and promulgating uniform standards for the identification of major rules and the development of RIAs, § 6(a)(2); establishing schedules for re-

---

**11.** Moreover, any "veteran of bureaucratic wars," *see* Maj. op. at 1296, is certainly familiar with the common practices of "assigning" and "detailing" top staff members from one agency to another, particularly to the White House, *see, e.g.,* S. REP. No. 353, 102d Cong., 2d Sess. 52 (1992) (supporting "White House efforts to reduce its reliance on detailees"), and with the existence in the Executive Office of the President of a separate unit, the Office of Administra-

tion, which is directed "to provide components of the Executive Office of the President with such administrative services as the President shall from time to time direct." Reorganization Plan No. 1 of 1977, 5 U.S.C.App. 1, § 2. Thus, there is little cause to worry that any high-level establishment within the Executive Office of the President will be a toothless tiger without its own independent staff.

views of RIAs, § 3(i); developing procedures for estimating annual costs and benefits of agency regulations, § 6(a)(6); developing procedures for the performance of his own functions under the order, § 6(b); requiring agencies to provide and evaluate additional information in connection with regulations or with their regulatory agendas, §§ 5(b), 6(a)(3); requiring the publication of regulatory agendas in a prescribed form, § 5(b)(2); waiving the requirements of the order with respect to any existing or proposed major rule, § 6(a)(4); and preparing, in consultation with the agency, recommendations for changes in the agency's statutes, § 6(a)(7). The Task Force was also entrusted with resolving any issues raised under the order or ensuring that they were presented to the President. *See* § 3(e)(1). One need not "strain" to construe this Executive Order as granting the Task Force substantial independent authority. *See* Maj. op. at 1297.

Additional evidence in the record reveals that the President intended, and the Task Force provided, an active and independent force for regulatory reform. The President instructed the Chair of the Task Force to "take clear, constructive, and decisive action to restrain Federal regulation and to improve the regulatory process." Memorandum for the Heads of Executive Departments and Agencies, Office of the Vice President, Mar. 25, 1981; Press Release, Office of the Vice President's Press Secretary, Mar. 25, 1981 (Task Force "was instructed by the President to take action, not write reports"). By the Administration's own accounts, the Task Force exercised its powers to the fullest, undertaking the final review of regulations of "truly major consequence," Press Release, Office of the Vice President, Feb. 17, 1981; Press Release, Office of the White House Press Secretary, Feb. 18, 1981; "direct[ing]" federal agencies to propose new rules, Press Release, Office of the Press Secretary to the Vice President, Mar. 10, 1987; Press Release, Office of the Press Secretary to the Vice President, Jan. 29, 1988; "recommend[ing]" that federal agencies propose certain rules, Press Release, Office of the Vice President, July 14, 1987; "conven[ing]"

working groups representing key agencies to develop appropriate legislative proposals and responses," Press Release, Office of the Vice President, Feb. 17, 1981; Press Release, Office of the Vice President, April 10, 1987; "designat[ing] ... rules and regulatory programs for high-priority agency consideration," PRESIDENTIAL TASK FORCE ON REGULATORY RELIEF, REAGAN ADMINISTRATION REGULATORY ACHIEVEMENTS, Aug. 11, 1983, at 5; *id.* at 78; Press Release, Office of the White House Press Secretary, Feb. 4, 1982; making "decisions" and taking "actions" to address the submissions it receives. Remarks of Vice President George Bush at the Presidential Task Force on Regulatory Relief Briefing, Aug. 12, 1981; and "target[ing]" existing regulations for in-depth agency consideration, *id.*

The Task Force was directly involved not only with other executive agencies but with Congress and with the public. It "work[ed] actively with those in the Congress to achieve legislative change in the regulatory area," Press Release, Office of the Vice President's Press Secretary, June 13, 1981. It also "formally request[ed]" private sector comments to itself and to the agencies, Press Release, Office of the Vice President, March 25, 1981, and its counsel advised business leaders: "If you go to the agency first, don't be too pessimistic if they can't solve the problem there. If they don't, that is what the Task Force is for." C. Boyden Gray, Remarks at Transcription of Hall of Flags Regulatory Reform Briefing (Apr. 10, 1981), *reprinted in Role of OMB in Regulation: Hearings of the Oversight and Investigations Subcomm. of the House Comm. on Energy & Commerce,* 97th Cong., 1st Sess. 92 (1981), *cited in* Erik D. Olson, *The Quiet Shift of Power: Office of Management & Budget Supervision of Environmental Protection Agency Rulemaking Under Executive Order 12,291,* 4 VA.J.NAT.RES.L. 1, 56 n. 283 (1984).

These functions equal or surpass those of every entity determined to date to be a FOIA agency and satisfy every judicial articulation of the *Soucie* "sole function"

test.[12] Like the OST in *Soucie,* 448 F.2d at 1075, the CEQ in *Pacific Legal Foundation,* 636 F.2d at 1263, and the Defense Nuclear Facilities Board in *Energy Research Foundation,* 917 F.2d at 584, the Task Force evaluated federal programs. Instead of evaluating only scientific, technological or environmental programs, however, the Task Force evaluated regulatory programs across the spectrum of executive agencies. *See* Press Release, Office of the Vice President, Feb. 17, 1981 (Task Force was "in charge of the President's overall regulatory reform program"). Its evaluation functions included: identification of duplicative, overlapping and conflicting rules; the final review of regulations of "truly major consequence"; identifying specific areas where it believed reporting and paperwork requirements could be reduced and, in coordination with the OMB, reviewing these requirements in order to reduce them; reviewing agencies' legislative recommendations; and reassessing federal regulations and paperwork requirements. It is significant that the Task Force's evaluation functions were geared not just toward counseling the President, but toward guiding its own interactions with the OMB and other executive agencies. Although the CEA's functions included evaluation, *see Rushforth,* 762 F.2d at 1042 n. 6, Judge Randolph later pointed out that all of its duties "simply facilitate[d] providing advice to the President." *Ener-*

*gy Research Foundation v. Defense Nuclear Facilities Safety Board,* 917 F.2d at 584. By contrast, the Task Force's evaluation function shaped its decisions and actions directed toward executive regulatory agencies.

Like the Defense Nuclear Facilities Board, *see Energy Research Foundation,* 917 F.2d at 585, the Task Force imposed reporting requirements on federal agencies. Under Executive Order No. 12,291 the Task Force could direct the head of the OMB to require agencies to provide additional information in connection with their regulations or regulatory agendas; determine the standards for and the form in which agencies filed their RIAs and agendas; and, by designating rules as major rules, sharply increase the reporting requirements incident to the rules. The Task Force also satisfies *Rushforth*'s requirement of ability to take "direct action." *Rushforth,* 762 F.2d at 1041. The President instructed the Task Force to "take action," Press Release, Office of the Vice President, Mar. 25, 1981, and the Task Force claimed to have followed those instructions. It announced that, after formally requesting private sector comments about governmental regulation directed to itself and to the agencies, it made "decisions" and took "actions" to address these submissions. For example, the Task Force announced the EPA's "bubble" rule as one of the "actions taken" by the Task Force.

**12.** It is worth noting that the Task Force also possessed certain characteristics that this court has found relevant, if not required, in determining agency status. In *Sierra Club v. Andrus,* we noted that Congress had signalled the "importance of the OMB's power and function, over and above its role as presidential adviser," when it provided for Senate confirmation of the OMB's director and deputy director. 581 F.2d at 902. Congress has similarly required the Senate's advice and consent in the selection of the head of OIRA, who serves as the Executive Director of the Task Force. 44 U.S.C. § 3503(b) (1988). And to the extent that it is relevant that the OST assumed the functions of an entity that was itself an agency, the National Science Foundation, *see* Maj. op. at 1291, the Task Force assumed many functions *previously exercised exclusively* by the OMB. Under President Ford, for example, the OMB by itself evaluated agencies' Inflation Impact Statements and set criteria for determining which rules had to be ac-

companied by these statements. Exec. Order No. 11,821, 3A C.F.R. § 926 (1971–1975 Compilation), *modified by* Exec. Order No. 11,949, 3 C.F.R. § 161 (1976). Under President Carter, the OMB *by itself* guided agencies in performing the detailed regulatory analyses required under Executive Order No. 12,044. Exec. Order No. 12,044, 3 C.F.R. § 152 (1978). Executive Order No. 12,291, of course, goes farther than either of its predecessors in asserting central presidential control over the regulatory process. *See* Harold H. Bruff, *Presidential Management of Agency Rulemaking,* 57 Geo.Wash.L.Rev. 533, 549 (1989) ("The Reagan administration's program for oversight of regulation is the most ambitious to date."); Peter L. Strauss & Cass R. Sunstein, *The Role of the President and OMB in Informal Rulemaking,* 38 Admin.L.Rev. 181, 185 (1986) (Executive Order 12,291 and Executive Order 12,498 represent the "most dramatic steps" in asserting presidential authority over the regulatory process).

Again like the Defense Nuclear Facilities Board, which "force[d] public decisions about health and safety," *Energy Research Foundation,* 917 F.2d at 584–85, the Task Force "directed" the Department of Health and Human Services and the Food and Drug Administration to make certain drugs available to AIDS patients, and claimed credit for regulations on the use of alternative fuels, as well as the "bubble" rule.

Finally, the Task Force exercised two of the three functions—coordinating regulatory programs, issuing guidelines and promulgating regulations—by which this court distinguished the CEA, which was not an agency, from the CEQ, which was. *Rushforth,* 762 F.2d at 1041. While the CEQ coordinated only environmental regulatory policy, the Task Force was "in charge of the President's overall regulatory reform program." The Task Force issued guidelines for all regulatory agencies on the preparation of the mandatory RIAs. And while it may not have published regulations in the *Federal Register,* its guidelines were, nonetheless, binding on federal regulatory agencies. *See* Exec. Order No. 12,498, § 1(d), 3 C.F.R. § 323 (1986), *reprinted in* 5 U.S.C. § 601 note (1988). Moreover, it had far-reaching authority to shape the regulations of all regulatory agencies, through the final review of regulations of major consequence, the direction to federal agencies to propose new rules, the selection of rules for special scrutiny or for reconsideration, and the scheduling of the centralized review of all major regulations. Thus, it is easily distinguished from the CEA, which, as the *Rushforth* court noted, "ha[d] *no* regulatory power." *Rushforth,* 762 F.2d at 1043 (emphasis added). To the contrary, the Task Force's functions beyond advising and assisting the President equaled or exceeded those of the CEQ, and

clearly sufficed to distinguish it from the CEA and to qualify it as an agency.

In assessing the Task Force's functions, the majority makes three fundamental errors. The first goes to the scope of the delegation of authority to the Task Force. The majority asserts that Executive Order No. 12,291 did not authorize "the Task Force, *qua* Task Force, to give directions to the executive branch." Maj. op. at 1293. To the contrary, the Executive Order expressly authorized the Task Force to give effective direction to the OMB,[13] and through the OMB, to other executive agencies. In so doing, the Task Force directed what is "often called the most powerful agency in the United States Government." J. PARRIS, CONGRESSIONAL RESEARCH SERVICE, THE OFFICE OF MANAGEMENT AND BUDGET: BACKGROUND, RESPONSIBILITIES, RECENT ISSUES i (1978), *cited in* Olson, *supra,* at 5. The Task Force's authority to direct other executive agencies was only fortified by Executive Order No. 12,498, which made the Task Force's regulatory policy guidelines binding on the agencies. *See* Exec. Order No. 12,498, § 1(d), *reprinted at* 5 U.S.C. § 601 note. Curiously, the majority cites this increase in the Task Force's direct authority over the agencies as a sign that the Task Force didn't "direct[ ] anyone ... to do anything." Maj. op. at 1294. In Executive Order No. 12,498, however, the President didn't just say to the agencies, "do as *I* say," but instead, "do as the *Task Force* says." Thus, the President in Executive Order No. 12,498 underscored his delegation to the Task Force of the authority to direct the agencies through the issuance of binding policy guidelines.[14]

The majority's description of the scope of the President's delegation to the Task Force comes not from the terms of the

---

**13.** The Executive Order by its own terms recognizes the OMB as an executive agency. Exec. Order No. 12,291, § 1(d).

**14.** Of course, even before the issuance of Executive Order No. 12,498, federal agency compliance with other Task Force and OMB directives under Executive Order No. 12,291 was hardly optional. *See* Exec. Order No. 12,291 § 2 (agencies "shall" adhere to order's cost-benefit requirements; regulatory action "shall not be un-

dertaken" unless costs outweigh benefits); *id.* § 3(f)(1) (agency "shall" consult with the OMB Director at his request and "shall" refrain from publishing regulatory analyses or notice of rulemaking until his review is complete); *id.* § 5(b) (OMB Director, subject to the direction of the Task Force, may "require" agencies to provide additional information and "require" publication of regulatory agendas in a particular form).

Executive Order itself or the Task Force's own account of the authority it exercised (which the majority rejects as "not reliable evidence," Maj. op. at 1294), but instead principally from its own conjecture and surmise. For example, the majority would measure the Task Force's "independent authority" by the extent to which its actions are not dependent on "continuing interaction with the President." Maj. op. at 1293. There is no evidence in the record that the Task Force had *any* continuing interaction with the President, and ample evidence, as discussed above, that it was authorized to act, and indeed acted, on its own. The majority surmises, nonetheless, that the Task Force, which was chaired by the Vice President, did not exercise any significant independent authority in part because "Presidents are ... reluctant to delegate real supervisory authority over the executive branch to the Vice President" who is not subject to the President's removal power.[15] Maj. op. at 1295. The majority relies on this general hypothesis about presidential behavior instead of on the Administration's own statements that Executive Order No. 12,291 did in fact constitute a delegation of the President's supervisory authority. *See, e.g.*, Press Release, Office of the Vice President, Mar. 25, 1981 (Task Force to "take action"); Office of Legal Counsel, Memorandum on Proposed Executive Order Entitled "Federal Regulation" (Jan. 28, 1981), *reprinted in* 5 OP.OFF. LEGAL COUNSEL 59, 63 (1981) (President through Executive Order No. 12,291 "authoriz[ed] the Task Force and OMB Director to supervise agency rulemaking"); *id.* at 64 (Task Force

and OMB Director "authorized to require an agency to defer rulemaking"). Only by "screening out" the Executive Order's and the Administration's descriptions of the Task Force's substantial independent authority can the majority conclude that the Task Force was merely "screen[ing] the regulatory issues" for the President's review. Maj. op. at 1297.[16]

For example, the majority cavalierly dismisses, Maj. op. at 1294, the President's explicit delegation to the Task Force of the authority either to resolve disputes arising under the order or to determine when a dispute required the President's personal attention. The President's delegation to the Task Force of the authority to keep an issue from even reaching his desk is a clear indication of the Task Force's significant authority to deal independently with regulatory issues. The majority's statement that it "seems implicit" that the Task Force would not on its own resolve disputes without presenting them to the President is directly contradicted by the express language of the Executive Order, and by the Vice President's own assertion that the Task Force presented disputes to the President only "if necessary," *see* Press Release, Office of the Vice President, Feb. 17, 1981 (the "most sensitive questions" arising under Executive Order No. 12,291 "will be brought in timely fashion to the Presidential Task Force (and, if necessary to the President himself)"; "regulations of truly major consequence are brought before the Presidential Task Force (and the President, if necessary) for final review").[17] The ma-

15. Ironically, after noting the dangers of a presidential delegation to an independent Vice President, the majority is willing to assume that the Vice President, in the exercise of his Task Force leadership, "presumably will not express direction to others in the executive branch unless his view is shared by the President." Maj. op. at 1295. Thus, the majority seems to believe that the court should assume the Vice President's loyalty to the President where it would be "dangerous" for his own President to do so.

16. If the Task Force were merely reviewing or "screening" issues for the President's consideration and action, without more, it would not differ significantly from the Council of Economic Advisers, which we determined was not an agency. *See Rushforth,* 762 F.2d at 1043 (CEA's

review of federal programs was connected to its function of making recommendations to the President); *see also Defense Nuclear Facilities Board,* 917 F.2d at 584 (CEA's duties "simply facilitate[d] providing advice to the President"). The evidence indicates, however, that the Task Force had significantly more independence than does the CEA.

17. In determining how an agency functions, we have previously relied on its *authorized* functions, not merely its *exercised* functions. *See Rushforth,* 762 F.2d at 1041 (distinguishing the CEQ from the CEA by the executive order authority that had been delegated to the former). Thus, we have read *Soucie* to declare that the OST was an agency because "it could take direct

jority further suggests that, should the Task Force itself resolve disputes according to the President's known wishes, it would not be acting "independently." *See* Maj. op. at 1294–95. By this definition, virtually no loyal government body would be sufficiently "independent" to qualify as an agency. Only renegades or freelancers who ignored or disregarded the President's orders would be seen to "act independently."

The majority's resort to a thirty-year-old treatise about the presidency, Maj. op. at 1296, "maxims" about staff capture, Maj. op. at 1296, and the supposed beliefs of "veterans of bureaucratic wars," Maj. op. at 1296, to determine how the Task Force actually functioned, and its dismissal of the Task Force's Executive Order authority as "beside the point," Maj. op. at 1294, is troubling, to say the least.[18] It discredits the two best and most reliable indications of the Task Force's role: the authority granted by the express terms of the Execu-

tive Order itself, and the Administration's own accounts of how the Task Force operated.

The majority's second fundamental error is in creating and applying an "operational proximity" test that represents a strained reading of the legislative history and runs directly counter to our precedent. The majority asserts—without citing any support from the legislative history or case law—that operational proximity in the sense of "continuing interaction" is, in part, what Congress contemplated when it exempted the President's "immediate personal staff" from the definition of an "agency." Maj. op. at 1293. Even assuming that "operational proximity" was a consideration in exempting the President's "immediate personal staff,"[19] it should be confined to this exemption. The majority's error is in confusing the "immediate personal staff" exemption, which is not at issue here, with the "sole function" exemption, which is a separate inquiry.

action," *Rushforth,* 762 F.2d at 1041 (emphasis added), not because it *did* take that action. This is certainly the correct reading of *Soucie,* in which we inquired into the functions that had been *delegated* to the OST, rather than those that it had exercised. *See Soucie,* 448 F.2d at 1075 (examining functions that were "transferred" to or "inherited" by the OST).

Furthermore, it would be unreasonable to require FOIA plaintiffs to "document," *see* Maj. op. at 1294, a putative agency's actual exercise of each of its delegated functions, since the entity's very denial of its agency status under the FOIA deprives the plaintiffs of the necessary documentation. In cases such as this one, where delegated authority may be exercised informally, there will often be no more than second-hand accounts of its exercise. *See, e.g.,* Erik D. Olson, *The Quiet Shift of Power: Office of Management & Budget Supervision of Environmental Protection Agency Rulemaking Under Executive Order 12,291,* 4 VA.J.NAT.RES.L. 1, 44 n. 210 (1984) (citing *Hearings on OMB Control of OSHA Rulemaking: Hearings Before a Subcomm. of the House Comm. on Gov't Operations,* 97th Cong., 2d Sess. 4–5, 20–26, 55, 316–19 (1982)) (account of the Task Force's actual exercise of its power to resolve a dispute between OMB and OSHA).

In any event, whether or not the Task Force actually exercised its delegated dispute resolution function should not be dispositive of its agency status. The record amply demonstrates that the Task Force both possessed and exercised sufficient other functions to put it within the realm of FOIA agencies. And its authority

to resolve disputes—whether or not ever exercised—only enhanced its position in the executive branch and reinforced its other express delegations of authority to direct the regulatory efforts of federal agencies.

Of course, this does not mean that an entity's actual exercise of unauthorized functions could not subject it to agency status under the FOIA. To hold otherwise would be to permit irregular organizations or activities to escape disclosure. Instead, the inquiry should extend to functions that were either authorized *or* exercised, not just those that were authorized *and* exercised.

**18.** Disregarding the record evidence of the Task Force's active involvement in regulatory reform, the majority paints a picture of a "virtually powerless" group that was not an "independent actor" in the executive branch. Maj. op. at 1296. The real power, they suggest, resided not with this Cabinet-level Task Force chaired by the Vice President, but with the OMB. Frankly, this conjures up visions of the OMB as a looming, booming, electronic Wizard of Oz, exhorting us to "pay no attention to that man behind the curtain." Where, as here, the "man behind the curtain" is undertaking functions that are legally significant to our inquiry, we cannot and must not disregard them.

**19.** I see little point in pursuing an inquiry into the scope of or the congressional intent behind the "immediate personal staff" exemption, as this case calls on us to construe only the "sole function" exemption.

The Conference Report, of course, said that the definition of "agency" to include establishments in the Executive Office of the President was to be interpreted to exclude "the President's immediate personal staff *or* units in the Executive Office whose sole *function is to advise and assist* the President." CONF.REP. at 13 (emphasis added). We and the Supreme Court have interpreted "immediate personal staff" to refer to the staff of the Office of the President, also known as the White House Office, one of the fourteen units within the Executive Office of the President,[20] and accordingly have granted FOIA exemptions to persons or offices within the White House Office without applying the "sole function" test. *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156, 100 S.Ct. 960, 971, 63 L.Ed.2d 267 (1980) ("The FOIA does render the 'Executive Office of the President' an agency subject to the Act. 5 U.S.C. § 552(e). The legislative history is unambiguous, however, in explaining that the 'Executive Office' does not include the Office of the President."); *National Security Archive v. Archivist of the United States*, 909 F.2d 541, 545 (D.C.Cir.1990) (noting that the Supreme Court "ha[d] made clear that the Office of the President is not an 'agency' for purposes of the FOIA" and that the Office of Legal Counsel was part of that Office) (*citing Kissinger, supra*). The majority correctly "assumes" that the President's "immediate personal staff" encompasses "*at least* those approximately 400 individuals employed in the White House Office," Maj. op. at 1293 n. 3 (emphasis added), but then attempts to extend its "operational proximity" concept beyond the confines of the White House Office and to incorporate it into the "sole function" test.

This is not only an illogical reading of the two tests established in the legislative his-

tory, it is also at odds with our "sole function" precedent. We made clear in *Ryan*, 617 F.2d at 789, that regardless of an entity's close proximity to or continuing interaction with a President, it is a FOIA agency unless its *sole function* is to advise and assist the President. Thus, to the extent that we focus on how closely the entity works with the President, the "sole function" test, and not "operational proximity" is the proper inquiry.

Furthermore, by the majority's broad definition of "proximity," virtually every person or entity within the Executive Office of the President would be excluded from the FOIA, contrary to the statute's express inclusion of the Executive Office of the President in its definition of agency. For example, under the majority's "operational proximity" test, the Director of the OMB, determined by the majority to be the cabinet officer "functionally ... closest to the President," Maj. op. at 1294, would, on the basis of that proximity, be a shoo-in for exclusion from the FOIA, but no one disputes that the OMB, along with its director, is subject to the FOIA.

The OMB's recognized operational proximity to the President, *see* Peter L. Strauss & Cass R. Sunstein, *The Role of the President and OMB in Informal Rulemaking*, 38 ADMIN.L.REV. 181, 185 (1986) (OMB "acts in some respects as the President's personal staff"); Christopher C. DeMuth & Douglas H. Ginsburg, *White House Review of Agency Rulemaking*, 99 HARV.L.REV. 1075, 1083 (1986) (OMB's role "is to serve as the eyes and ears of the president and to advance" the President's policies), does not negate the fact that the OMB is an establishment within the Executive Office of the President whose functions go beyond advising and assisting the President. When the statute expressly includes establishments within the Executive Office of the Presi-

---

**20.** *See* Reorganization Plan No. 1 of 1977, 5 U.S.C.App. 1. The White House Office, which has roughly 400 employees, "concentrates on close personal support including policy and political advice and administrative and operational services." *Id.* (Message of the President). Other units within the Executive Office of the President, which has over 1800 employees, include the Office of Management and Budget, the National Security Council, the Council of Eco-

nomic Advisers, the Office of Policy Development and the Office of the Special Representative for Trade Negotiations. *See* Charles R. Babcock, *Hard to Pin Down What Taxpayers Give at Top Office*, WASH. POST, Oct. 19, 1992, at A19; H.R.REP. No. 618, 102d Cong., 2d Sess. (1992) (accompanying the bill appropriating funds for the Executive Office of the President); H.R.REP. No. 919, 102 Cong., 2d Sess. (1992) (same).

dent, while the accompanying report language excludes only "immediate personal staff" and those whose "sole function" is to advise and assist the President, I have to read the report language to qualify, not obliterate, the statutory directive.

Finally, on the question of proximity to the President, it is important to note that the plaintiff does not seek records of the President, of the Vice President, nor yet of the Office of the Vice President.[21] Instead, she seeks the records of a separate functional entity operating partly out of the Office of the Vice President and partly out of the Office of Management and Budget.

The majority's third fundamental error in assessing the Task Force's agency status is to confuse its *composition* or its *structure* with its *functions*. It finds inordinate significance in the fact that the members of the Task Force also served in other capacities as agency heads and members of the President's cabinet. That the President selected cabinet members to serve on the Task Force is not dispositive of its agency status[22] for a very simple reason: The relevant inquiry is whether there is a separate establishment within the Executive Office of the President with substantial authority to act independently, and not the status of the individual members who make up the entity.[23]

Although the majority professes to subscribe to the view that "form follows func-

21. The plaintiff requested not records of the Vice President "in his capacity as adviser to the President," but those "that were received or generated by the Task Force which he chairs." The district court below, having no evidence on whether the Office of the Vice President kept Task Force documents, withheld judgment as to whether the defendants would have to search there, too. Thus, the propriety of searching records of the Office of the Vice President is not before us.

22. Nor would the basic inquiry under *Soucie* be different if the Task Force's members included the entire cabinet. It would be unprecedented for a President to turn his cabinet loose to take substantial independent actions on its own and without his ongoing involvement and direction; I know of no instance of the President's delegating to the cabinet "*qua* cabinet" substantial independent authority. The President's cabinet traditionally has existed solely to advise and assist the President in the exercise of his own *retained* authority. The majority's own anecdote, in which President Lincoln participates in and overrules the decision of his cabinet, *see* Maj. op. at 1297 n. 9, underscores that the President had not delegated any of his authority to the cabinet. Nonetheless, should a President ever exercise his power to delegate substantial independent authority to the cabinet (or to an entity that included all of the cabinet members), there would be no barrier to our applying the *Soucie* "sole function" test to determine if the cabinet's (or this entity's) new and enlarged powers qualified it as a FOIA agency.

I do recognize that, in applying the *Soucie* test where the delegation of authority is informal, implicit or otherwise ambiguous, the structure employed might provide some indication of whether the President had, in fact, delegated substantial independent authority. *See* Maj. op. at 1297. In this case, however, the Task Force's substantial independent authority is expressly and unambiguously delegated in Executive Order No. 12,291 and amply confirmed through the Administration's own statements. It cannot be negated merely by reference to the Task Force's structure or composition.

23. Although this *Soucie* "sole function" test is the proper test for establishments elsewhere in the Executive Office of the President, we have not applied it to persons or offices within the Office of the President, or White House Office. *See Kissinger*, 445 U.S. at 156, 100 S.Ct. at 971; *National Security Archive*, 909 F.2d at 545; *see also Ryan*, 617 F.2d at 789 (members of the presidential staff are exempt from FOIA). I recognize, therefore, that we would face a different question were we to consider the FOIA status of an entity comprised entirely of White House personnel, who have been exempt from FOIA in their traditional roles as the President's personal staff, but who now had stepped outside their traditional staff roles and were acting instead as principals to whom the President had delegated substantial independent authority. Since that question is not before this court, I do not address it. Since I do not address the question, I neither "dispute," *see* Maj. op. at 1297, nor endorse any conclusion as to its answer.

It does bear noting, however, that my recognition that an entity wholly within the White House Office presents a different case than the one before us is not "governed by fortuitous history," as the majority charges, Maj. op. at 1297, but by *Kissinger* and *National Security Archive*, which in turn were governed by the legislative history of the FOIA. My opinion also leaves open, as the majority correctly notes, Maj. op. at 1297, the question of the agency status of a hypothetical entity "composed partially of senior White House staff and cabinet officers." Maj. op. at 1297. Since that question, like the one involving White House staff alone, is not before the court, I do not reach it, either.

tion," Maj. op. at 1297, its reasoning is closer to "form dictates function." That is, it is willing to disregard a wealth of record evidence about the Task Force's actual and authorized independent functions because the structure of the Task Force—as a "partial cabinet group" with the Vice President at the helm—raises questions in the majority's eyes as to the Task Force's "real" independence. Maj. op. at 1295.[24]

The majority's focus on the composition of the Task Force is particularly puzzling in light of the majority's own identification of the three factors relevant under *Soucie* to determine whether entities like the Task Force are agencies: operational proximity, a self-contained structure (including an independent staff), and the scope and nature of the delegation from the President. Maj. op. at 1293, 1296. Although I disagree with the majority about the first two—which are entirely creatures of the majority's own making—the scope and nature of the President's delegation of authority is certainly the primary relevant inquiry. The majority, however, departs from its own inquiry into *what* the President delegated, that is, the degree of independent authority he gave the entity, and asks instead *to whom* he delegated this authority, that is, what other roles the members of the entity happen to play in the Administration. This inquiry is clearly inconsistent with the functional inquiry this court has applied in FOIA cases for twenty years.

### III. CONCLUSION

This case does not question the President's authority to supervise the oversight of federal regulations. The President's authority to "supervise and guide" subordinate executive officers in order to "secure th[e] unitary and uniform execution of the laws" is well-established. *Myers v. United States*, 272 U.S. 52, 135, 47 S.Ct. 21, 31, 71 L.Ed. 160 (1926). More specifically, we have acknowledged the President's need and authority to coordinate federal regulatory policy:

> The court recognizes the basic need of the President and his White House staff to monitor the consistency of executive agency regulations with Administration policy. He and his White House staff advisers surely must be briefed fully and frequently about rules in the making, and their contributions to policymaking considered. The executive power under the Constitution, after all, is not shared—it rests exclusively with the President.

*Sierra Club v. Costle*, 657 F.2d 298, 405 (1981); *see also In re Permanent Surface Mining Reg. Litigation*, 13 ENV'T REP. CAS. (BNA) 1586, 1597 (D.D.C.1979) (consultation between the President's advisers and other entities in the executive branch permissible). To exercise that power, the President and his close advisers must be able to communicate freely, and, in some cases, without public scrutiny. *See Sierra Club*, 657 F.2d at 406 ("Our form of government simply could not function effectively or rationally if key executive policymakers were isolated from each other and from the Chief Executive."). This case, however, unlike *Sierra Club*, does not involve face-to-face strategy sessions be-

Finally, in regard to White House staff, I question the majority's characterization of the Task Force as the "functional equivalent[ ] of assistants to the President," or senior White House staff. Maj. op. at 1294. The White House staff presumably advises and assists the President in the conduct of all his responsibilities, and without incurring FOIA responsibilities. There are two key distinctions, however. First, White House staff members presumably assist *the President* in *his* review of regulations, while the Task Force independently exercised the President's delegated authority to review those regulations. Second, as discussed above,

even if the Task Force were functioning in a manner equivalent to White House staff, the relevant FOIA inquiry differs for White House staff and for other establishments within the Executive Office of the President.

24. Even if, as the majority urges, an entity's structure were to be given this overwhelming significance, I fail to see how the structure of the Task Force, which was headed by the "only senior official in the executive branch totally protected from the President's removal power," Maj. op. at 1295, would belie the executive order's express delegation of substantial independent authority.

tween the President and his policymakers. Rather, it involves a separate functional establishment within the Executive Office of the President to which the President delegated some of his executive powers. We have a clear expression of congressional intent that the records of such establishments are generally subject to the FOIA. *Cf. Sierra Club*, 657 F.2d at 407 (determining lawfulness of undocketed meeting with the President "in the absence of any further Congressional requirements" on docketing). Because the Presidential Task Force on Regulatory Relief does not fall within the *Soucie* exception to FOIA coverage, it must, consistent with the directives and exemptions of the FOIA, make its records available to those who request them.

Nor does this case question the President's authority to establish any kind of high-level structure—or no structure—within the Executive Office of the President to direct the regulatory reform effort. The President can choose to accomplish his regulatory objectives through his own actions, through an establishment created pursuant to his executive order authority, through an entity created through a congressionally-approved reorganization plan, or simply through rump sessions with his cabinet members. But the President must live with the consequences of his choice, one of which may be the requirements of the FOIA. We recognized this indisputable fact in *Ryan v. Department of Justice*, 617 F.2d 781, 789 (D.C.Cir.1980): "In many different areas the President has a choice between using his staff to perform a func-

tion and using an agency to perform it. While not always substantively significant, these choices are often unavoidably significant for FOIA purposes, because the Act defines agencies as subject to disclosure and presidential staff as exempt." [25] The majority, nonetheless, chafes at these consequences, *see* Maj. op. at 1297, apparently concerned that the cloak of presidential privilege does not and cannot extend as far as the President's delegated authority. It is one thing, however, to say that the President's conversations with his closest advisers, here the Task Force members, are confidential. It is quite another to say that when the Task Force goes forth to exercise substantial independent authority, the President's consultative privilege extends not only to the Task Force in its communications to those whose work they direct, such as the Administrator of the OMB's OIRA, who served as the Task Force's Executive Director, but even to communications between the Task Force and representatives of regulated industries. I am perplexed as to how the majority could label such an approach "forthright." Maj. op. at 1297. The most the President can be said to have "openly disclose[d]," Maj. op. at 1297, is a review mechanism by which the substance of and the outside participants in the review can remain cloaked in secrecy.

Instead of addressing the Task Force's authority to direct the President's regulatory reform efforts, this case questions its authority to shroud its actions in absolute secrecy.[26] Similarly tasked entities within

---

**25.** My colleagues find it "unclear just what factors" would lead me to distinguish this arrangement from similar arrangements that would not require FOIA disclosure. Maj. op. at 1297. I had hoped that my opinion made clear that the factors are, first, those that determine whether the "arrangement" creates an agency under FOIA; and second, if there is an agency, those factors that determine whether any particular communications with the agency can be kept confidential under a FOIA exception.

**26.** Many commentators have decried the impenetrable veil of secrecy surrounding presidential intervention in rulemaking. *See, e.g.*, Kenneth C. Davis, *Presidential Control of Rulemaking*, 56 TUL.L.REV. 849, 850–51 (1982) (the "harmful element" of secrecy in White House intervention

under Executive Order No. 12,291 results in unfair procedure and impaired accountability); Alan B. Morrison, *OMB Interference with Agency Rulemaking: The Wrong Way to Write a Regulation*, 99 HARV.L.REV. 1059, 1064 (1986) ("the entire process [of review under Executive Order No. 12,291] operates in an atmosphere of secrecy and insulation from public debate that makes a mockery of the system of open participation embodied in the Administrative Procedure Act (APA)"); Erik D. Olson, *The Quiet Shift of Power: Office of Management & Budget Supervision of Environmental Protection Agency Rulemaking Under Executive Order 12,291*, 4 VA.J.NAT.RES.L. 1, 14 (1984) (OMB's "propensity for secrecy ... tends to undercut the value of OMB review); Steven T. Kargman, *Note, OMB Intervention in Agency Rulemaking: The Case for Broadened Record Review*, 95 YALE L.J. 1789,

**1314**

the Executive Office of the President, most notably the OMB, operate without such a cloak. Shortly after the enactment of Executive Order No. 12,291, the Office of Legal Counsel advised the OMB that certain substantive communications from the OMB to rulemaking agencies or from outside parties to the OMB pursuant to the order should be disclosed in the administrative record. (The OLC exempted substantive communications from the OMB that formed part of the agency's deliberative process.) Office of Legal Counsel, Contacts Between the Office of Management and Budget and Executive Branch Agencies Under Executive Order No. 12,291 (Apr. 24, 1981), *reprinted in* 5 OP. OFF. LEGAL COUNSEL 107, 110–12 (1981). The OMB itself expanded on this disclosure policy in 1986 under a directive issued by Wendy Gramm, then the Administrator of the OMB's Office of Regulatory Affairs. OMB, Memorandum for the Heads of Departments and Agencies Subject to Executive Orders 12,291 and 12,498 (June 13, 1986), *reprinted in* OMB, REGULATORY PROGRAMS OF THE UNITED STATES GOVERNMENT, APRIL 1, 1988—MARCH 31, 1989 (1988), app. III, at 529–31. Even supporters of a strong presidential role in supervising the regulatory process stress the importance of public disclosure of most OMB communications under Executive Order Nos. 12,291 and 12,498. *See, e.g.,* Peter L. Strauss & Cass R. Sunstein, *The Role of the President and OMB in Informal Rulemaking,*

38 ADMIN.L.REV. 181, 188–90, 192 (1986). In fact, one Administrator of OIRA testified that "the very purpose of ... Executive Order 12,291 is to make regulatory decisions more transparent and accessible." Statement of Christopher DeMuth, OIRA Administrator, Before the Subcomm. on Administrative Law & Governmental Relations of the House Judiciary Comm. (July 28, 1983), *reprinted in Regulatory Reform Act: Hearings Before the Subcomm. on Admin. Law and Governmental Relations of the House Comm. on the Judiciary,* 98th Cong., 1st Sess. 895, 922 (1983).

Given the *Realpolitik* of the workings of the Executive Office of the President, it is candidly hard to see how disclosure of the same genre of communications by and to the Task Force, which worked hand-in-glove with the OMB, sharing its staff, records, and responsibilities under Executive Order No. 12,291, would pose any significant potential for disruption of the President's valid oversight functions. In fact, it would seem that the objectives of the OIRA disclosure procedures—and FOIA itself—would be thwarted if comments sent to the OMB or the OIRA are subject to public access, while similar comments on the very same matter directed to the Task Force are never revealed.[27]

The majority's approach thus creates two tracks: The Task Force, which is charged with the "overall direction" of the President's regulatory reform program, is shielded from disclosure laws, while the

1793 (1986) (Undisclosed OMB intervention results in "two different 'records': one reflecting what happened during the agency's public rulemaking proceedings, and the other reflecting what happened between the agency and OMB."); Ann Rosenfield, *Note, Presidential Policy Management of Agency Rules Under Reagan Order 12,498,* 38 ADMIN.L.REV. 63, 93 (1986) (because OMB regulatory review takes place "wholly in secret, it is hard to see how review of rulemaking has led to [the promised advantages of] the appearance of open government and increased agency accountability to the public"); *Note, Executive Orders 12,291 and 12,498: Usurpation of Legislative Power or Blueprint for Legislative Reform?,* 54 GEO.WASH.L.REV. 512, 530 (1986) ("secret presentations" to OMB "allow[ ] OMB to circumvent two related tenets of the APA: the requirement for giving interested parties the opportunity to submit materials into the rulemaking record, and the ban on ex parte commu-

nications") (citations omitted). *See also* H.REP. No. 919, 102d Cong., 2d Sess. 49 (1992) (expressing conferees' concerns about the lack of a public record of the regulatory review conducted by the Council of Competitiveness "or such other similar reviewing agency established within the Executive Office of the President").

27. The 1986 OIRA disclosure procedures themselves were a response to congressional pressure to open up the OMB's processes, under a threat of defunding the OIRA. *See Oversight of the Office of Management and Budget Regulatory Review and Planning Process: Hearing Before the Subcomm. on Intergovernmental Relations of the Senate Comm. on Governmental Affairs,* 99th Cong., 2d Sess. 56–58, 97–98 (1986); *see also* Harold H. Bruff, *Presidential Management of Agency Rulemaking,* 57 GEO.WASH.L.REV. 533, 582 (1989).

OMB, which operates under the Task Force's direction, is not. This clearly maps out the formula for getting around disclosure laws in the Executive Office of the President: First, put a small unit of decisionmakers atop a larger establishment of persons who carry out those decisions, and insist that because only the implementers have a staff, only they form the "agency." Second, when necessary, maintain that the "significant authority" resides only with the implementers, *see* Maj. op. at 1294, and that the "whole" of the decisionmaking unit is less than the sum of its parts. *See* Maj. op. at 1298. That is, if you sever the "brains" of an organization from the "body," the people who call the shots are never in the public's sights.[28]

Subjecting the Task Force, as well as the OMB, to the FOIA would not compromise either the President's legitimate oversight authority or his undisputed need for confidential policy deliberations, as the FOIA's exemption 5 expressly provides for a deliberative process privilege. In fact, the Administration invoked this privilege to shield certain documents requested by the plaintiff in this case. To the extent that the President or his close advisers need to protect sensitive policy discussions, they can more appropriately do so through the FOIA exemption, which protects particular records from disclosure, rather than through the FOIA agency determination, which bars *all* records from disclosure. *See Pacific Legal Foundation*, 636 F.2d at 1265 (where concern was protecting confidential advice to the President, court was unwilling to close all meetings, rather than those meetings in which such confidential advice was to be deliberated).

It is not enough to say, as the majority does, that the Task Force or its Chair is a "hair's breadth" or a "heartbeat" away from the President. This court has previously declined to exempt the President's closest advisers, his Cabinet members, from the FOIA: "Many Cabinet officers, like the Attorney General or the Office of

Legal Counsel under him, act as advisors to the President for many of their important functions; yet they are not members of the presidential staff or exclusively presidential advisors, and are thus not exempt from FOIA requirements." *Ryan v. Department of Justice*, 617 F.2d 781, 789 (D.C.Cir. 1980). *See also Soucie*, 448 F.2d at 1074 n. 22 (director of OST expected to replace the President's Special Assistant for Science and Technology in the capacity of personal adviser to the President on scientific matters). Nor is it enough to say that the Task Force operated at the highest levels of the White House. *Soucie* itself involved an agency created in the Executive Office of the President to provide "higher level" coordination of the nation's science policies. *Soucie*, 448 F.2d at 1074. Finally, it is not enough to say that the Task Force created the records at issue in its role of advising the President. The report at issue in *Soucie* was "requested by the President precisely for advisory purposes," *Ryan*, 617 F.2d at 788, as was the information the Attorney General had gathered in *Ryan*. *Id.*

Instead, the proper inquiry, as the district court noted, must center on the "functions and responsibilities of the Task Force, not the title of its Chairman or his other office," and on the evidence that the Task Force was not formed simply to advise and assist the President, but rather had "substantial, independent, directorial authority." The majority recognizes, as it must, that the district court "applied the correct governing law...." Maj. op. at 1291. As the extensive prior discussion demonstrates, and as the district court found as well, such an inquiry leads ineluctably to a recognition that the Task Force is an "agency" under the FOIA test. Accordingly, I would affirm the district court's judgment, and dissent from my colleagues' contrary conclusion.

---

28. The majority thus misapprehends what it terms my concern about exposing OMB directives. *See* Maj. op. at 1294. I understand full well that the OMB is subject to disclosure, but I recognize that such disclosure is indeed a hollow gesture if the key records both influencing and documenting the actions taken by the OMB are funnelled only through the Task Force.